# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/26/2020 11:28 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street   Phoenix, Arizona  85004

Telephone:  602-606-2810        Facsimile:  602-606-2811

Brian J. Foster, Arizona Bar Number 012143 (*pro hac vice pending*)
Ross P. Meyer, Arizona Bar Number 028473 (*pro hac vice pending*)
admin@wb-law.com
*Attorneys for Plaintiffs*

Howard King, California Bar Number 77012
John Snow, California Bar Number 280790
**KING, HOLMES, PATERNO & SORIANO, LLP**
1900 Avenue of the Stars
Twenty Fifth Floor
Los Angeles, CA 90067
Phone: 310-282-8989
Email: **JSnow@kphslaw.com**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL JUDICIAL DISTRICT

| | |
|---|---|
| **SOLARMORE MANAGEMENT SERVICES, INC.**, a California corporation; **CARL AND BARBARA JANSEN**, a married couple,<br><br>Plaintiffs,<br><br>vs.<br><br>**NIXON PEABODY, LLP**, a New York limited liability partnership; **FORREST DAVID MILDER**, a married individual,<br><br>Defendants. | Case No. 20STCV32546<br><br>**COMPLAINT**<br><br>**(Breach of Fiduciary Duty, Breach of Contract, Unjust Enrichment, Negligent Misrepresentation, Legal Malpractice, and Aiding and Abetting)**<br><br>**(Jury Trial Requested)** |

5609.060/1609186.1

**PRELIMINARY STATEMENT**

Plaintiffs' claims arise from a fraud scheme that eventually resulted in the losses of $2 billion to innocent purchasers, who thought they had purchased mobile solar energy generators qualifying for valid and significant tax benefits.

One scheme provided that DC Solar Solutions would build and sell mobile solar generators ("MSGs") to Funds, which were invested in by Purchasing Members. The Purchasing Members provided the Funds with money that equaled $150,000 for each MSG the Fund would purchase from DC Solar Solutions. Typically, the Fund would make a thirty percent down payment to DC Solar Solutions, which Nixon Peabody and Forrest Milder stated would qualify for alternative energy tax credits. The Funds would then execute a Promissory Note in favor of DC Solar Solutions, which would be paid over the course of twenty years, during which the Funds would be permitted to depreciate the MSGs on favorable tax terms. However, the sale of the MSGs and resulting tax credits proved to be a sham. In reality, there was no true market for the MSGs sold to the Fund and the $150,000 sale price was grossly overstated.

Nixon Peabody and Forrest Milder were directly involved in the DC Solar scheme by providing Tax Opinions to the Funds, including the Purchasing Member, to encourage them to execute the agreements that enabled the transactions described above. As Solarmore Management's attorneys, Nixon Peabody and Forrest Milder owed the Plaintiffs a fiduciary duty. Nixon Peabody and Forrest Milder were aware that the stated value of the MSGs was less than presented to the Funds because the Internal Revenue Service initiated an audit of some of the Funds as early as 2013. However, rather than alert each of the involved parties, including their clients, the Plaintiffs, Nixon Peabody and Forrest Milder, in conjunction with DC Solar Affiliates and the Principals, took steps to ensure Carl Jansen would become the hundred percent owner of Solarmore Management, which was the manager of and held an interest in the

Funds. The Defendants wanted Jeff Carpoff to no longer be associated with Solarmore Management so the Tax Opinions could state that an uninterested third party, Carl Jansen, was the sole owner of Solarmore Management, rather than Jeff Carpoff or Paulette Carpoff, which were the owners of DC Solar and its affiliates. However, this action did not resolve the issues surrounding the manufactured sales price of the MSGs, the lack of lease revenues, or the inability of the Funds to receive the benefit of the Tax Credits.

As a result, Nixon Peabody and Milder were able to continue to generate substantial legal fees as a result of continuing the DC Solar schemes and cause enormous damages to the Plaintiffs. Plaintiffs, for its complaint against Defendants, allege as follows:

## THE PARTIES

1.     Solarmore Management Services, Inc. ("**Solarmore Management**") is a California corporation authorized to do and doing business in California in the county of Los Angeles. Solarmore Management is currently owned and managed by Carl Jansen ("**Jansen**") (Solarmore and Jansen are collectively the "**Plaintiffs**").

2.     Jansen and Barbara Jansen ("**Jansen's Wife**") are a married couple residing in Illinois and doing business in the state of California in the county of Los Angeles.

3.     Until December 12, 2019, Solarmore Management was the managing member of the following California limited liability companies, which are collectively referred to as the "**Solar Funds**" or the "**Purchasers**" and generally referred to as the "**Funds**."

       a.   Solar Eclipse Investment Fund V, LLC

       b.   Solar Eclipse Investment Fund VI, LLC

       c.   Solar Eclipse Investment Fund VII, LLC

       d.   Solar Eclipse Investment Fund VIII, LLC

       e.   Solar Eclipse Investment Fund X, LLC

       f.   Solar Eclipse Investment Fund XI, LLC

g.   Solar Eclipse Investment Fund XII, LLC

h.   Solar Eclipse Investment Fund XIV, LLC

i.   Solar Eclipse Investment Fund XV, LLC

j.   Solar Eclipse Investment Fund XVI, LLC

k.   Solar Eclipse Investment Fund XVII, LLC

l.   Solar Eclipse Investment Fund XVIII, LLC

m.  Solar Eclipse Investment Fund XIX, LLC

n.   Solar Eclipse Investment Fund XXI, LLC

o.   Solar Eclipse Investment Fund XXII, LLC

p.   Solar Eclipse Investment Fund XXIII, LLC

q.   Solar Eclipse Investment Fund XXIV, LLC

r.   Solar Eclipse Investment Fund XXVI, LLC

s.   Solar Eclipse Investment Fund XXVIII, LLC

t.   Solar Eclipse Investment Fund XXXI, LLC

4.   Solarmore Management is currently the 1% owner in each of the Solar Funds except for Solar Eclipse Investment Fund V, Solar Eclipse Investment Fund VI, Solar Eclipse Investment Fund VII, Solar Eclipse Investment Fund X, Solar Eclipse Investment Fund XI, and Solar Eclipse Investment Fund XII in which Solarmore is the 95% owner.

5.   The Solar Funds are tax-equity funds permitted under the Internal Revenue Code (the "**Code**" or "**IRC**"), created specifically for the purpose of owning mobile solar generators ("**MSGs**").

6.   Along with the managing member of the Solar Funds, which was Solarmore Management up to December 12, 2019, each Fund has a purchasing member or members, which provided money to purchase the MSGs.

7.   As of December 18, 2019, Solarmore Management consented to resignation as managing member of the Funds but remains a member of the Funds.

8.     Nixon Peabody LLP ("**Nixon**") is a New York limited liability partnership doing business in California in the county of Los Angeles.

9.     Forrest David Milder ("**Milder**") is an attorney and partner of Nixon at its Boston, Massachusetts office and doing business in California in the county of Los Angeles.

## JURISDICTION & VENUE

10.     This Court has subject-matter jurisdiction over Plaintiffs' claims because the claims arise under the laws of the State of California.

11.     This Court has personal-matter jurisdiction, as each of the Parties are either California entities or persons doing business in California in the county of Los Angeles.

12.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

a.   Transacted business in California in the county of Los Angeles;

b.   Contracted to supply or obtain services in California in the county of Los Angeles;

c.   Availed themselves intentionally of the benefits of doing business in California in the county of Los Angeles;

d.   Produced, promoted, sold, and/or distributed their products or services in California in the county of Los Angeles, and thereby have purposefully profited from their access to markets in California in the county of Los Angeles; and

e.   Caused tortious damage by act or omission in California in the county of Los Angeles.

13.     Venue is proper in this Court under Code of Civil Procedure section ("§") 395.5.

. . .

. . .

**FACTUAL ALLEGATIONS**

14.     Mike Silva ("**Silva**") formed DC Solar Solutions Mfg., Inc. on or around July 30, 2009 in California.

15.     Jeff Carpoff ("**Carpoff**") and Paulette Carpoff (collectively the "**Carpoffs**") formed DC Solar Solutions, Inc. on or around September 29, 2010 in California.

16.     The Carpoffs were involved with DC Solar Solutions Mfg., Inc. from its inception.

17.     On or around March 5, 2012, DC Solar Solutions Mfg., Inc. changed its name to DC Solar Solutions, Inc. (each is referred to as "**DC Solar Solutions**") and filed documents with the California Secretary of State stating that Carpoff was its president and Paulette Carpoff was its secretary.

18.     The Carpoffs incorporated DC Solar Distribution, Inc. ("**DC Solar Distribution**") in California on or around September 29, 2010.

19.     In or about 2010, DC Solar Solutions created the first Funds, Solar Eclipse Investment Fund, LLC and Solar Eclipse Investment Fund III, LLC, each California limited liability companies, to own MSGs and solicit MSG purchases for tax benefits.

20.     Solarmore Management Services, Inc. ("**Solarmore Management**") is a California corporation that was formed on or around November 7, 2013, by Carpoff.

21.     Around the time of Solarmore Management's formation, Carl Jansen ("**Jansen**") came to hold a twenty-one percent membership interest, while Carpoff continued to hold the remaining seventy-nine percent.

**1.   Nixon and Carpoff's Method Behind the Solar Eclipse Investment Funds**

    **A.   Generally**

22.     The Carpoffs would create investment funds (e.g., Solar Eclipse Investment Fund V-VIII, X-XII, XIV-XIX, XXI-XXIV, XXVI, XXVIII, XXXI) (generally referred to as the

"**Fund**"), which would permit the investors to own a significant portion of the Fund ("**Purchasing Member(s)**"), and would purchase MSGs from DC Solar Solutions that were then leased to DC Solar Distribution, which would allegedly re-lease the MSGs to generate revenue, which would pay the Fund for the lease that would repay the loan from DC Solar Solutions.

23.     After the first few Funds were established, Solarmore Management was created to manage the Funds that purchased MSGs.

24.     In managing the Funds, Solarmore Management would own 1% of each Fund, while the Purchasing Member would own the remaining 99% of the Fund. After five years, and the expiration of the tax benefits, the ownership would flip and Solarmore Management would own 95% of the Fund ("**Flip Event**").

25.     For its 1% interest in each Fund, Solarmore Management paid DC Solar Solutions valuable consideration.

B. **The Process for Ensuring Investment into the Solar Eclipse Investment Funds**

26.     The Purchasing Member would typically make a 30% down payment of the total purchase amount to DC Solar Solutions on the MSG, through the Fund entity, which were sold for $150,000 each. For example, if a $28,800,000 total purchase price was negotiated for the MSGs, the Purchasing Member would originally make a down payment in the amount of $7,200,000 to the individual fund, which was provided to DC Solar Solutions, and then hold a $21,600,000 promissory note, which was payable over different terms to DC Solar Solutions.

27.     Purchasing Members could then, immediately, claim a dollar-for-dollar tax credit based upon 30% of the $150,000 price. Purchasing Members could also claim depreciation for each MSG for the next five years. These tax benefits were significant and amounted to hundreds of millions of dollars across the Funds.

28.     In arranging the transactions, Purchasing Members executed a standard package of agreements, including: (i) a Limited Liability Company Agreement ("**LLC Agreement**"); (ii) a Solar Equipment Purchase Agreement ("**Purchase Agreement**"); (iii) a Secured Promissory Note ("**Promissory Note**"); and (iv) a Mobile Solar Equipment Lease ("**Equipment Lease**") (together the "**Fraud Contracts**").

29.     Nixon prepared tax opinion letters (generally referred to as "**Tax Opinion(s)**") confirming that the MSGs qualified for the "Energy Credit" under IRC § 48 to be provided to the Purchasing Member prior to execution of the Fraud Contracts.

30.     IRC § 48 allows for a thirty percent tax credit for certain energy-related investments (hereinafter, the "Tax Credit" or the "Credit").

31.     Thus, Purchasing Members expected to be able to take a Tax Credit for roughly the same amount as their cash contribution to the Fund.

32.     The Tax Opinions indicated that the proposed structure and agreements would provide the Purchasing Member five years of Tax Credits.

33.     The Tax Opinions each stated "that the allocations of income, gain, deduction, loss and credit as set forth in the Company Agreement, including the shift from 99:1 to 5:95, should be considered neither shifting nor transitory and should pass an 'overall substantiality' test within the meaning of Section 1.704-1(b)(2)(iii) of the Regulations and should therefore be considered to have substantial economic effect and should therefore be respected."

34.     Further, the Tax Opinions provided "we are of the view that such diligent efforts [to lease the MSGs] should ensure that the Mobile Solar Facilities continue to be eligible for the Energy Credits (and thus, not subject to recapture), notwithstanding that such Mobile Solar Facilities are not continuously in use."

35.     Nixon and Milder were aware and knew that the Tax Opinions would be provided to the Purchasing Members to ensure they were comfortable with the prospect of the Tax Credits and to indicate that the benefits were available to the Purchasing Members.

36.     The Tax Opinions provided that "For the period beginning after the Flip Date (the end of the year which is the fifth anniversary of the Company placing all the Mobile Solar Facilities in service), the allocations of profits, losses and tax credits to the [Purchasing Member] will be changed to 5% of profits, losses and tax credits for all income of the Company and 95% to [Solarmore Management]."

37.     The Tax Opinions stated Nixon was counsel or acted as counsel to Solarmore Management, DC Solar Solutions, and DC Solar Distribution.

38.     Nixon and Milder invoiced Solarmore Management at least $608,016 for its preparation of the Tax Opinions.

39.     Solarmore Management paid these invoices to its attorneys at Nixon.

40.     Through the Fraud Contracts, DC Solar Distribution promised that it would arrange to sub-lease the MSGs to end-users.

41.     The revenue from these sub-leases was essential for the Funds to be able to repay the Promissory Notes to DC Solar Solutions and to justify the $150,000 purchase price of each MSG.

42.     While the Fraud Contracts were executed, Carpoff would execute the Purchase Agreement on behalf of DC Solar Solutions, while Paulette Carpoff would execute the Equipment Leases on behalf of DC Solar Distribution.

43.     While certain documents of the Fraud Contracts had minor variations in wording, all of the Fraud Contracts largely contained the same substantive terms.

44.    Under the terms of the LLC Agreements, an investor became the Purchasing Member of an individual Fund, a special purpose LLC entity created specifically for the purchase of MSGs.

45.    The Fund then purchased MSGs from DC Solar Solutions at a price of $150,000 per MSG under the Purchase Agreement.

46.    The Purchase Agreement specified the total number of MSGs being purchased in that specific transaction, as well as the total purchase price.

47.    An Exhibit to the Purchase Agreement contained a blank space for the VINs for the MSGs or stated that "VIN for each Generator [MSG] to be Supplied at Delivery."

48.    In exchange for the specified payment, DC Solar Solutions agreed to deliver the MSGs by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

49.    The delivery dates of the MSGs specified in the Purchase Agreements were occasionally scheduled in tranches.

50.    The Purchase Agreements dictated that payments would be due to DC Solar Solutions in tranches according to a schedule in part dictated by capital contributions being made by the Purchasing Member under the terms of the LLC Agreement.

51.    Those capital contributions were contingent on the Purchasing Members receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

52.    Purchasing Members generally contributed about thirty percent (30%) of the purchase price in cash and financed the balance pursuant to a Promissory Note(s) executed by the Fund in favor of DC Solar Solutions.

53.    The Promissory Note was an exhibit to the Purchase Agreement.

C. **Knowledge of the Fraud**

54.     Forrest Milder ("**Milder**") is an attorney of Nixon, based in its Boston, Massachusetts office, and one of its "lead tax partners when it comes to tax credits and other tax-advantaged investments."

55.     Milder works "hard to stay at the forefront of the industries in which [he is] involved. For example [he is] very active in the Solar Energy Industry Association's Tax Committee, and [he] authored part of its recent proposal to the IRS on the solar tax credit regulations."

56.     Milder was often with Carpoff and the DC Solar affiliates in California, including Los Angeles.

57.     During this time in Los Angeles, California, Nixon and Milder worked to determine the best legal course for Carpoff and the DC Solar affiliates.

58.     Starting as early as 2013, red flags began emerging in the DC Solar affiliates' operations.

59.     For example, during this time DC Solar Solutions, the Funds, and the Carpoffs individually became subject of audits by the Internal Revenue Service ("**IRS**") and the State of California regarding income, sales, and franchise taxes.

60.     At the latest, Nixon was made aware of the 2013 IRS Audit in 2013, which raised significant issues with the structure and likelihood of the Purchasing Members and Funds receiving the Tax Credits.

61.     Milder responded to learning this information by stating, "An audit from the IRS? Is this even old enough to be audited?"

62.     In subsequent emails to the Carpoffs and others, (collectively, including Milder, the "**Principals**"), Milder informed the parties that he had spoken with Cherly Meder ("**Meder**")

of the IRS in an attempt to prevent a full fledged audit. Milder expressed that he and Meder had concerns about $25 million of tax deductions, while the company had no income.

63.    As of 2013, Nixon and Milder were aware that DC Solar Distribution had created or reported minimal revenue from the purported leases.

64.    The Principals then scheduled for Meder to visit the DC Solar affiliates' facilities.

65.    After the IRS investigation and 2013 Audit, the IRS issued a report on or around August 18, 2016 (the "**Report**"). The Report provided that "[t]he partnership entity that is the subject of this audit, Solar Eclipse Investment Fund III (Solar Eclipse) is a sham because it does not involve any meaningful risk or opportunity for gains. Similarly, The Sherwin-Williams Company was not a bona fide partner. Under both theories, substantially all items of credit and deduction are re-allocated to the managing partner, Solarmore Investments, Inc."

66.    The Report further provides, "This appraisal presents only a FMV valuation, and does not address cost basis. Because the latter is the only value allowable under these circumstances the A&M appraisal is categorically not applicable for calculating the IRC § 48 Tax Credit. Even if the FMV were allowable in this case, the A&M appraisal is unacceptable. The taxpayer (Solar Eclipse Investment Fund III, LLC) used a related-party circular transaction and an unacceptable appraisal to overstate the value of its energy property. The taxpayer purchased the property from a related party in a non-arms-length transaction. The purported purchase price was seller-financed and the repayment on the loan was financed by leases to parties related to the seller. Taxpayer's repayment of the loan does not represent a genuine economic outlay, and thus does not reflect an arms-length purchase price. The IRS has adjusted the taxpayer's basis in the energy."

67.    In discussing the actual basis, the IRS Report stated, "The taxpayer used its related-party purchase price of $150,000 per unit to calculate the tax credit. An IRS engineer has

made an independent estimate of the taxpayer's costs basis for one of these mobile solar generators. Exam estimates the taxpayer's cost basis of one unit was less than $25,000 per unit in that year. The IRS revenue agent and engineer have also looked for the best information of the property's cost basis, and find a credible cost basis for the set of 152 trailer units to be $2,496,000-or approximately $13,000 each, a lower unit cost due to economies of scale."

68.     While knowing this and that the 2013 Audit was under investigation and ongoing, Nixon and Milder continued to issue Tax Opinions with the same framework as the ones in question under the Report.

69.     For example, on November 29, 2016, Nixon and Milder issued a Tax Opinion with regards to Solar Eclipse Investment Fund XXVI, LLC. Within this opinion, Nixon stated "there is no litigation or governmental proceeding pending or threatened against or involving the Mobile Solar Facilities, the Company, the Managing Member, the Sponsor, the Lessee, the Investor Member, or any Affiliates of the foregoing, that would materially adversely affect the business of the Company or the condition of the Mobile Solar Facilities."

D.  **Nixon and Milder's Sleight of Hand to Skirt the Report**

70.     Nixon and Milder were made aware of significant issues through the 2013 Audit, which required a modification of the parties' relationship. The modification removed Carpoff as a 79% owner of Solarmore Management and had Jansen take this interest. The change permitted the Tax Opinions to state that the sponsor, DC Solar Solutions, Inc., was owned 100% by Carpoff, the Lessee, DC Solar Distribution, Inc., was owned 100% by Paulette Carpoff, and the Managing Member, Solarmore Management Services, Inc., was owned 100% by Jansen, "someone who is completely unrelated to the other parties to the transaction."

71.     On information and belief, Nixon and Milder were critical in ensuring this modification to the Solarmore Management occurred.

72.     This change occurred after the 2013 IRS Audit investigation began.

73.     Essentially, the Principals, including Nixon, attempted to ensure an unrelated party to the transactions by having Jansen become the hundred percent owner of Solarmore Management, which was the Managing Member of the Funds.

74.     On information and belief, Ronald Roach ("**Roach**"), the CPA and Accountant for the DC Solar enterprise, and Nixon and Milder, the attorneys for the DC Solar affiliates, evaluated the investigations of the 2013 IRS Audit and understood the problems associated with Carpoff being associated on nearly all sides of the transactions.

75.     On information and belief, Nixon and Milder formulated a plan for a third party, which ended up being Jansen, to become the 100% owner of Solarmore Management so that the Tax Opinions could state, Solarmore Management was owned 100% by Jansen, "someone who is completely unrelated to the other parties to the transaction."

76.     Roach approached Jansen in or around December 2014, and indicated that he should take over Solarmore Management, as the one-hundred percent owner.

77.     On information and belief, Nixon and Milder were aware of Roach's approach as an attempt for the DC Solar affiliates to skirt the issues presented in the Report.

78.     Jansen inquired as to the value of the MSGs because he was aware that Solarmore Management would be responsible for the remaining balance of the Promissory Notes at the Flip Event.

79.     Jansen was told that the MSGs would retain a significant amount of their value after the Flip Event, which was above the loan balance still owed to DC Solar Solutions.

80.     The Principals ensured that Jansen was informed that the MSGs had a value in excess of the remaining balance on the Promissory Notes plus $10,000 for each MSG.

81. Therefore, of the 7,000 units the Funds would own, Jansen expected to be the owner of units, which would have a net value of $70,000,000.

82. Unbeknownst to Jansen, however, Nixon and Milder were aware that the MSGs were not being leased at the rates as indicated in the Fraud Documents.

83. Based on the representations made to Jansen by the Principals, Jansen agreed to become the 100% owner of Solarmore Management.

84. Without payment of these Promissory Notes from true third-party leases, all of DC Solar affiliates would come crashing down, which eventually occurred.

85. Determining a method in which the Carpoffs could continue deploying their scheme was in the best interest of each of the Principals, but not Jansen, as each of the Principals continued to be paid substantial amounts of their fees as long as new Fraud Documents were executed and new funds were created.

86. During 2016 and 2017, as some of the Funds began nearing the Flip Event, Jansen, believing Solarmore Management would soon be the majority member of those Funds and effective owner of thousands of MSGs, began asking questions of the Carpoffs and other involved parties regarding potential tax implications and other ownership-related effects.

87. Nixon and Milder knew the Lease revenues from end-users of the MSGs were critical to the legitimacy of the businesses of DC Solar Solutions and DC Solar Distribution because it was to provide the money that DC Solar Distribution needed to make lease payments to the Funds, and those payments were critical to the Funds' ability to make payments on the Promissory Notes to DC Solar Solutions.

88. While Jansen was asking questions to Nixon and Milder, Milder responded to Jansen stating, "Now you know why you are the hundred percent owner of Solarmore Management."

89.     Because Jansen had begun asking questions and seeking additional information that he realized he was not being provided, to conceal their actions, the Principals initiated the creation of Halo in 2016, with Roselli as the managing member.

90.     Upon information and belief, Roselli was or is a personal friend of the Carpoffs and had a previous business relationship with Paulette Carpoff.

91.     After Halo was formed, it took the previous place of Solarmore Management, as the managing member of the new funds.

92.     This insured that the Principals could continue perpetuating their scheme and ensuring additional Fraud Documents would be completed and funded.

93.     Although DC Solar Distribution purported to be earning millions each month in lease revenue from end-users of the MSGs, bank records demonstrate that DC Solar Distribution generated minimal lease revenue from subleases to end-users.

94.     Email records demonstrate that the sublease revenue was $138,138.64 for 2012, $278,179.74 for 2013, $321,717.06 for 2014, and $1,419,570.80 for 2015, for a grand total over four years of $2,157,606.24.

95.     The actual cash requirement from the subleases of the MSGs under DC Solar Distribution's lease program over that same four-year period – stated as a percentage of promised utilization – was a dismal 3.78%.

96.     The failure of the sublease program also endangered the touted tax benefits of the MSG transactions.

97.     This failure of the sublease program also invalidated the stated appraisal value of MSGs for ongoing or new purchaser transactions.

98.     On information and belief, Nixon was aware of the lagging sublease revenues while continuing to execute the Tax Opinions, ensuring additional Fraud Documents and Funds were created.

99.     On or about 2017, SolarSense, a solar energy provider, began negotiations to buy MSGs from an existing Fund.

100.    However, rather than taking a promissory note carryback note to DC Solar Solutions, SolarSense attempted to arrange financing for its purchase of MSGs through KeyBank.

101.    During KeyBank's due diligence, KeyBank requested, among other things, a list of end-user/subleases, pro forma financials for DC Solar Distribution, samples of subleases, and DC Solar Distribution's QuickBooks.

102.    On information and belief, SolarSense and KeyBank closed their transaction in reliance on the Principals' representation and promise of information to be delivered.

103.    On information and belief, KeyBank began to suspect, after closing, the claimed subleases and claimed sublease revenues were false.

104.    The Principals informed Jansen of the sale of the MSGs from the existing Fund, which made him ecstatic because it showed that his risk of becoming the 100% owner of Solarmore Management was validated by a third party. However, Jansen and the third-party were not aware of the fraud perpetuated on SolarSense and KeyBank, which made the excitement short lived.

105.    In December 2018, law enforcement agents executed federal search warrants at DC Solar's headquarters and other locations, seizing over $60 million in assets.

106.    On January 30, 2019, the first DC Solar company filed for Chapter 11 bankruptcy.

107.   Thereafter, additional DC Solar-affiliated companies filed for Chapter 11 bankruptcy.

108.   Subsequently all the DC Solar Chapter 11 cases were converted to Chapter 7 liquidation.

109.   In learning the information that Nixon and Milder were aware of, as early as 2013, the Plaintiffs incurred substantial costs and damages in an attempt to correct the damages caused by Nixon and Milder.

110.   For example, the Plaintiffs were required to pay legal fees in order to enter the tolling agreement associated with this action, make advances to and for the benefit of the Funds, operating expenses of Solarmore Management and the Funds, expenses to locate the actual MSGs that existed, attorneys' fees to benefit the Funds, at least one million dollars of penalties and interests to the IRS, which Nixon and Milder determined would be avoided because of the Tax Credits for the benefit Solarmore Management, and the loss of its expectation profits from the sale of the MSGs (the "Additional Damages").

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**

**(Breach of Fiduciary Duty)**

111.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

112.   Solarmore Management became a client of Nixon and Milder on or around its formation in November 2013.

113.   Nixon stated, in each of the Tax Opinions, that it was the counsel for Solarmore Management.

114.   As an attorney for Solarmore Management, Nixon and Milder owed Solarmore Management a fiduciary duty, which includes a duty of loyalty.

115.   Nixon and Milder owed Jansen a fiduciary duty when Jansen was a twenty-one percent and one-hundred percent owner of Solarmore Management.

116.    Nixon and Milder breached the fiduciary duty by failing to provide Solarmore Management or Jansen, the information it had related to the lack of justification for the Tax Opinions.

117.   Nixon and Milder breached their fiduciary duty by choosing the interests of the Principals, including the Carpoffs, over those of Solarmore Management and Jansen.

118.   Nixon and Milder breached their fiduciary duty by failing to provide Solarmore Management or Jansen information it knew, which caused substantial risk and damage to Jansen in becoming a one hundred percent owner of Solarmore Management.

119.   In addition, upon information and belief, Nixon and Milder breached their fiduciary duties to Solarmore Management and Jansen in ways that are currently unknown to Plaintiffs but will be learned during discovery.

120.   Nixon and Milder's breaches of their fiduciary duty proximately caused the damages suffered by Solarmore and Jansen.

121.   While Solarmore Management and Jansen will prove their damages at trial, their damages include, but are not limited to, attorneys fees paid to Nixon and Milder, costs of acquiring the hundred percent ownership in Solarmore Management, the cost of acquiring one percent in each of the Funds, the Additional Damages, and any damages that result from the personal guarantees that were required in each of the Fraud Documents.

## COUNT II

### (Breach of Contract)

122. Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

123. Solarmore Management and Nixon entered into a contract to provide legal services relating to its interest in each of the Funds.

124. Solarmore Management paid Nixon's invoices for these legal services under the contract.

125. Under the contract, Nixon and Milder were to provide Solarmore Management and Jansen legal advice that was accurate and complete, as well as advise their clients on issues relating to the DC Solar affiliates that could effect their interest in the Funds.

126. Defendants breached the contract by providing legal advice that it knew or should have known was incorrect.

127. Solarmore Management relied on this legal advice, to its detriment.

128. Specifically, Nixon and Milder incorrectly advised Solarmore Management and Jansen that the Tax Credits would be authorized and that Solarmore Management would become the owner of numerous MSGs, which had a value in excess of the Promissory Notes that were due by the Funds to DC Solar Solutions.

129. As a result of Nixon and Milder's breach of the contract, Solarmore Management and Jansen have suffered damages that will be proven at trial, which will include, but not be limited to, attorneys fees paid to Nixon and Milder, costs of acquiring the hundred percent ownership in Solarmore Management, the cost of acquiring one percent in each of the Funds, and any damages that result from the personal guarantees that were required in each of the Fraud Documents.

20

130.    Plaintiff is entitled to an award of its reasonable attorneys' fees and costs pursuant to Code of Civil Procedure §§ 1021, 1717, as the contract between Plaintiffs and Nixon awards attorneys' fees to the prevailing party in an action related to a breach of that contract.

## COUNT III

### (Unjust Enrichment *brought in the alternative*)

131.    Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

132.    In the alternative to Plaintiffs' breach of contract claim, Plaintiffs' allege Nixon and Milder were unjustly enriched at the expense of Solarmore Management and Jansen.

133.    Nixon and Milder benefited from of hundreds of thousands of dollars from Solarmore Management, to continue executing Fraud Documents, which it knew were premised on false assumptions.

134.    Solarmore Management and Jansen were deprived of the Solarmore Management funds that were paid to Nixon and Milder.

135.    Nixon and Milder knew that if Solarmore Management and Jansen knew the truth, they would not continue participating in the Funds.

136.    As a result Solarmore Management and Jansen were damaged in an amount to be proven at trial, which will include, but not be limited to, the attorneys fees paid to Nixon and Milder by Solarmore Management, and any other funds Nixon and Milder acquired related to the Funds, Fraud Documents, and Tax Opinions.

## COUNT IV

### (Negligent Misrepresentation)

137.    Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

138. Nixon and Midler misrepresented significant amounts of representations throughout their representation of Solarmore Management.

139. Specifically, Nixon and Midler misrepresented the value of the MSGs in the Tax Opinions.

140. Nixon and Midler misrepresented that the Fraud Documents and transactions related to the Funds were under audit by the IRS and the impact these audits would have on the Funds.

141. Nixon and Midler were Solarmore Management's attorneys and had a duty to disclose the truth to their clients.

142. By ensuring that Solarmore Management and Jansen would not believe that there were any significant problems, Nixon and Midler achieved their intent, to prevent Solarmore Management and Jansen from inquiring further about the ongoing transactions, and to ensure that additional Funds were created.

143. Nixon and Midler knew that Solarmore Management and Jansen did not know the truth about the lease revenues and the audits of the Funds.

144. Solarmore Management and Jansen had an expectation to believe that their attorneys, they were paying hundreds of thousands of dollars to, would alert them or inform them of concerns relating to the Fraud Documents and audits by governmental agencies.

145. Because Solarmore Management and Jansen did not know the truth, which Nixon and Midler knew, they continued to operate as the Manager of new Funds, and continued to pay Nixon's attorneys' fees and invoices, and continued to purchase a one-percent membership interest in each of the Funds.

146. The specific amount of damages will be proven at trial.

# COUNT V

## (Legal Malpractice)

147.    Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

148.    Solarmore Management was a client of Nixon and Milder.

149.    As a client, Nixon and Milder owed a duty to use the skill, prudence, and diligence as commonly exercised by other members of the legal profession.

150.    Nixon and Midler breached this duty by perpetuating the Fraud Documents, including the Tax Opinions, and the Funds' transactions to the detriment of their client, Solarmore Management.

151.    Nixon and Midler further breached this duty by putting their clients', DC Solar Distribution, DS Solar Solutions, and the Carpoffs, interests ahead of Solarmore Management, also their clients.

152.    In putting other clients' interests ahead of Solarmore Management's interest, the Plaintiffs were damaged an amount to be proven at trial, which includes, but is not limited to, attorneys' fees paid to Nixon and Midler for legal services that were not in their best interest, for purchasing and becoming the 100% owner of Solarmore Management when the Principals and Nixon knew that the lease revenues were substantially lower than expected or necessary to create value for the Funds, and for purchasing a one-percent membership interest in each of the Funds.

153.    Had Nixon and Midler performed their duty, as commonly exercised by other lawyers, Nixon and Midler would have advised Solarmore Management and Jansen to seek independent counsel that was not also counsel to the related parties or that had an interest in the Fraud Documents and Tax Opinions.

154.   Further, Nixon and Midler should have been able to advise Solarmore Management and Jansen to ask specific questions related to the sufficiency of the leases of the first operating Funds. Instead, Nixon and Midler concealed information from and ensured that Solarmore Management and Jansen were not informed about certain information, to ensure additional Funds would be created to grow their revenue.

## COUNT VII

### (Aiding and Abetting Negligent Misrepresentation)

155.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

156.   Nixon and Milder were aware of the problems caused by the relationship between Solarmore Management, the DC Solar affiliates, and the Principals.

157.   DC Solar affiliates and the Principals owed Solarmore Management and Jansen a duty through its contractual relationships and as business partners and investors in the Funds.

158.   Nixon and Milder knew that the execution of the Fraud Documents and the strategy for Jansen to become the one-hundred percent owner of Solarmore Management constituted a breach of these duties by the DC Solar affiliates and the Principals.

159.   Nixon and Milder provided substantial assistance and encouragement by issuing and continuing to issue the Tax Opinions after knowing the structure would not result in the Tax Credits and that the purported lease revenues were significantly lower than originally indicated.

160.   This action caused Solarmore Management to continue to invest in the Funds.

161.   These actions caused Jansen to become the one-hundred percent owner of Solarmore Management.

162.   These actions were done for the benefit of the DC Solar affiliates and the Principals to ensure Nixon and Milder would continue to receive attorneys' fees and revenue

1   from the work related to the DC Solar affiliates and the Principals. Without the creation of new

2   funds, Nixon and Milder knew the DC Solar affiliates would implode.

3        163.    Nixon and Milder owed a duty to Solarmore Management and Jansen to

4   competently advise their clients and put their clients' interests ahead of their own. By

5   encouraging the actions that were taken, Nixon and Milder breached their duties to Solarmore

6   Management and Jansen.

7        **WHEREFORE**, Plaintiffs request this Court to enter judgment in their favor and against

8   the Defendants as follows:

9        **A.**     Awarding the Plaintiffs compensatory damages in an amount to be proven at trial;

10       **B.**     Awarding the Plaintiffs punitive damages in an amount to be proven at trial;

11       **C.**     Awarding the Plaintiffs damages for their pain and suffering in an amount to be

12   proven at trial;

13       **D.**     Awarding the Plaintiffs their attorneys' fees and costs pursuant to Code of Civil

14   Procedure §§ 1021, 1717.

15       **E.**     Awarding the Plaintiffs interest on all sums awarded, said interest calculated at the

16   maximum rate allowed by law from the time of judgment until paid in full; and

17       **F.**     Granting the Plaintiffs such other relief as the Court may deem appropriate under

18   the circumstances.

19       **RESPECTFULLY SUBMITTED** this 26th day of August, 2020.

20                                */s/ John Snow*
                                  **Howard King, Esq.**
21                                **John Snow, Esq.**
                                  **KING, HOLMES, PATERNO & SORIANO, LLP**
22                                1900 Avenue of the Stars
                                  Twenty Fifth Floor
23                                Los Angeles, CA 90067

24

25

*/s/ Brian J. Foster*

**Brian J. Foster, Esq.**
**Ross P. Meyer, Esq.**
**WILENCHIK & BARTNESS, PC**
2810 N. 3rd Street
Phoenix, Arizona 85004

*Attorneys for Plaintiffs*

**ORIGINAL** electronically filed this _____ day of August, 2020 using the Courts E-Filing Online website.

By: _____